Incorporated. Argument is not to exceed 15 minutes per side. Mr. Glazer, when you're ready, you may proceed for the appellant. Thank you. May it please the court, Brad Glazer appearing on behalf of the plaintiff, Tanja Kovacevic. So this is the COVID case. Tanja Kovacevic filed suit under the Emergency Paid Sick Leave Act of 2020. Similar to the FMLA, the EPSLA made it unlawful to discharge an employee who took a leave under the act. At issue is whether the trial court failed to follow Supreme Court precedent when resolving a Rule 56 motion. More specifically, did the trial judge weigh evidence and draw inferences against the non-moving party, Kovacevic, when she concluded that Kovacevic was terminated not for her protected COVID leave, but for poor performance. In Reeves v. Anderson plumbing products, the Supreme Court expanded upon the Anderson Liberty Lobby rule with regard to how judges resolve Rule 56 motions in the context of an employment case. And in that case, the court, in addition to confirming that credibility determinations and the weighing of evidence are jury functions, not judge functions. If the company comes forward and says, look, her work was a train wreck and here's what it's cost us and here's what all this has done, don't you have to show it's pretext? We do have to establish that it's pretext, Your Honor. And then doesn't, and I know where the lower court kicked it, but just walk me through this. Isn't it relevant that there were 11 people that took COVID leave and only one was fired? Your Honor, I think that that has marginal relevance, but it's sort of like an age discrimination case. An employer can't say, well, we have all these other black employees. No, I get that. But I mean, here they've got considerable evidence that she didn't do a great job, to say. And they say that's the reason they would have fired her. Let me give it to you this way. If they decided to terminate her before she ever took leave, if we look at the evidence and see they decided to terminate her before she ever took leave, would you lose? Absolutely. Okay. So now explain to me what we do if we get to pretext. How do we find that's pretext? Well, we look at, first of all, I don't want to gloss over the holding in the Reeves case. Do you mind if I talk a little bit about that before I get into specifics? Go ahead. So in that case, the court said that the trial judge must disregard all evidence favorable to the moving party that the jury is not required to believe. And the court held that the trial judge should give credence to the evidence favoring the non-moving, which would be Kovacevic here, as well as evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses. So, Your Honor, we say this is where the judge erred. She relied on this declaration that was signed by Kovacevic's boss, Scott Goldberg, to support the conclusion that no reasonable jury could find that Kovacevic was fired due to her protected leave of absence. But Goldberg was hardly a disinterested witness. He was the one who made the decision to terminate Kovacevic. And getting to your point, Judge Thapar, there was ample reason for a reasonable jury to reject the picture painted by his declaration. The declaration suggests that Kovacevic was essentially incompetent. According to the declaration, cited throughout the trial judge's opinion, she was paying vendors who shouldn't have been paid, writing checks that should not have been written, and voiding checks at an unprecedented pace. But Kovacevic's testimony, on the other hand, paints a very different picture. She explains that she was trained to write checks based on the QuickBooks ledger, and she relied upon Benton to match the invoices with the QuickBooks records. Very often, she would need to void checks because of Benton's errors. And she noted that Goldberg, as part of his training of her, would point out individual mistakes that she made, but he never told her that he was contemplating replacing her, that she was on a path towards formal discipline, or that she needed to improve her performance in order to remain employed. But didn't Goldberg and several other people who were above her talk before the COVID leave about the problems that her work involved, the substandard performance, and weren't they looking for a replacement before the COVID leave? So there was no discussion with her. There was no discussion between Goldberg and the Human Resources representative with regard to her performance before she took her COVID leave. There were five emails that were sent that could be considered critical of her performance or could be considered as constructive criticism so that she could improve her job. Weren't they looking on this Indeed site to find someone to replace her before the COVID leave? There was a posting to Indeed that was made for this position before she took her FMLE leave, that is true. There is no evidence that any of the people that applied through Indeed were contacted, and she was not replaced until about a month after her termination. And she was not told that her job was in jeopardy at any time. But if they're looking, why doesn't that cut against your case? I think it does cut against your case, Your Honor. I'm not suggesting that that evidence should be thrown out. The issue is, should this be a jury determination weighing the evidence in her favor and the evidence against her? Kovacevic also pointed to her offer letter and the AIF handbook that noted she should expect to get regular performance evaluations at 30, 60, 90, and 180 days. A reasonable jury could conclude that if AIF planned to replace her for poor performance before her COVID leave, she would have been told that she was struggling with her performance in at least one of those intervals. But she never received a single performance evaluation. And Kovacevic also cast doubt on the assertion that Goldberg only discovered the extent of her alleged incompetence during the COVID leave. She missed six business days of work during the leave. And during that time period, Goldberg did not memorialize any of the alleged performance deficiencies that were later included in his declaration. Barber also testified that the first he heard of issues surfacing during this six-day period was the day after she asked to be returned to her job. And Kovacevic also relies on the timing of the termination. Because there will seldom be eyewitnesses to the employer's mental processes, this court gives significant weight to when an employee is fired in relationship to the protected conduct. And here, the timing is exquisite. The termination is announced the day after she asked to be returned to work. And finally, Kovacevic points to the scramble to create a paper trail of poor performance that begins almost immediately after she challenges her termination. When she told Goldberg and Barber that you can't fire me because I have COVID, it is at that time that AIF management first begins to document a case of poor performance. In Danielson v. City of Lorain, which is cited in our reply brief, the court noted that if an employee successfully demonstrated that the employer deliberately created a paper trail documenting poor performance only after deciding to terminate the employee because of her protected status, the employee would be entitled to judgment no matter how inadequate her work performance. In Reeves, the Supreme Court stated that the employer will be entitled to judgment as a matter of law if the record, quote, conclusively reveals some other nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue, and there is abundant and uncontroverted independent evidence that no unlawful termination took place. But, Your Honors, those are not the facts in this case. Because the trial judge relied upon a declaration from an interested party and drew inferences in favor of AIF based on the declaration, and because the trial judge weighed the evidence, contrary to this court's admonition in Reeves, this court should reverse the trial court's summary judgment order and remand the case for trial. Thank you. Good morning. May it please the Court, Emily Megan Clayton on behalf of American International Foods, the FLE. There's one issue in this case, and that's whether appellant presented sufficient evidence to show that she was actually terminated for taking COVID-related leave, and American International Foods' reason for terminating her per work performance is merely pretextual. The district court in this case found that there was insufficient evidence in the record to create a genuine issue of material fact on the issue of pretext and granted summary judgment in favor of AIFI. She did so on three bases, primarily. The temporal proximity alone was not enough, and the timing was not particularly suspicious in this case because of the additional issues that Mr. Goldberg, who was her supervisor, discovered while she was out on leave. The second reason was that American International Foods' failure to formally counsel her or give formal performance evaluations was not suggestive of pretext because the policies in the AIFI handbooks were completely discretionary. So as her manager, he could review her at any time and for any reason. I'm sorry? What kind of documentation was there about the performance issues before the posting of the job? Did they talk to her at all, or was it in a file somewhere? What do we have in the record? I'm curious. Well, there's several emails specifically addressed to her by Scott Goldberg, and they were also working together regularly. So a lot of their interactions were on a three times a week, at least, basis. Orally, he was giving her feedback at every check run of this is wrong and that's wrong, and here's how you should be doing it. And there's several emails in March and then in August documenting that and saying we can't have these issues continue to happen. Here's how you need to be doing it. If you can't do it this way, you have to come talk to me. But there's no formal review process. There's no 30 days, 60 days, sit down, here's what's good, here's what's bad. Those were not required under their policies. I know they're not required. I'm just curious whether they happened. They did not do it with her, no. His practice was to give informal feedback and coaching with new hires. He would always do annual reviews, but that was his practice. It was also not a completely unheard of practice within AIFI. As Director of Operations, Tom Michel, testified that he would do a similar thing with his direct reports when they were new, depending on how they were progressing with their training. So there is no documentation the way many companies do of documenting a worker's poor performance and saying explicitly in a document you need to do this or else, or alternatively putting her on a PIP, a performance improvement plan. None of that happened. There's no documentation that you have referred to specifically happening before she took the leave. No, there isn't, Your Honor. But as I said, it's not required under their policies. Their policies are just completely discretionary in that it is up to her manager to review her at any time in the way he sees fit prior to that first annual review. Their progressive discipline policy was likewise discretionary. And it said basically that the company may discipline or discharge an employee with or without cause or with or without notice. And then said the company believes in progressive discipline in appropriate circumstances. But when we, you know, your opponent has emphasized the Reeves case and the question about who is entitled to inferences in this situation of determining whether the firing is pretextual or not. Why isn't he correct? He's not correct because that's not what Judge Jarboe did. The record is undisputed. Ms. Kovacevic offered no evidence to support her position. She essentially said, I didn't make enough mistakes to think that I would be fired. There's no policy that required her to be formally reviewed. Why don't we have two interested parties each saying their view of the facts. Her deposition was taken, right? So she's explaining why any errors that she made were not sufficient to constitute a fireable offense. And you have Goldberg on the other hand saying, well, I was trying to tell her all along. And then she's out and then Goldberg says, I did her work for five days and saw how awful it was. But Goldberg didn't document that until after she raises the claim that she's being terminated because she's taking COVID leave. With respect, Your Honor, that's not really what happened. And I'd like to address Mr. Goldberg's declaration and state for the record that appellant counsel's argument with respect to that has been waived. It was never raised below in the trial court. He had no issue with his declaration at that time or any of the other declarations that were filed with our summary judgment brief. Are you saying that he waived the point that looking at all of the evidentiary material that your client presented, there still is not enough to prevent her from arguing pretext? I'm not sure I understand Your Honor's question. Of course, on summary judgment, a judge cannot weigh the credibility of evidence, but she did not do that here. She took Mr. Goldberg's declaration at face value that these were the things that he found. She did the same thing with Ms. Kovacevic's declaration wherein she pointed to this comment from HR Director Bob Barber saying, you're the best employee because you're always so happy at work. Your point is in response to Reeves, as I understand it, that of course the district judge can accept the evidence if there's not disputed evidence to the contrary. Correct. And so you're saying, meaning your friend on the other side, did not put forward evidence disputing Goldberg? Correct. His own client, Ms. Kovacevic, testified throughout her deposition. She didn't dispute any of the instances that Mr. Goldberg brought up with her. She admitted that those were mistakes that she had made, including significant errors. She essentially said, I just didn't think I had done enough to get fired. But she also admitted she was an at-will employee. As an at-will employee, there's no quantum of incompetence that you need to show to get fired. And since their policies are completely discretionary, he was not required to document it in any particular way. She could have made an error and she could have gone into work and he could have terminated her. That's not what happened here. Right, but the problem in a case where there's some action, such as her taking COVID leave that's protected under this particular act. Sorry, I'm getting laryngitis. The question is, when there's the temporal proximity to taking the leave and the firing, is that enough to show retaliation when there is evidence that she's saying she's doing a good enough job and Goldberg is saying she isn't? She didn't really say that she was doing a good enough job, Your Honor. She admitted she was performing as she was performing. She tried to deflect and put those errors on to Ashley Benton, who was essentially the receptionist, who would open the incoming mail and match physically the invoice with the purchase order. It was Kovacevic's job to match it in QuickBooks. And that's one of the deficiencies of performance that Kovacevic had, was an inability to enter the correct information in QuickBooks, search for that information, and therefore pay. Why isn't that a question of credibility? She says that it was this other person's job. Your side says, no, it was her job. Why isn't there a credibility question for a trier of fact to resolve? Because she admitted to what her job description was. So she's inherently self-contradictory. Correct. She admitted to all these errors. She admitted to her job description. Even with all of the voided checks, she said, yes, there were many, many checks, but sometimes he caught the problem, and sometimes I caught the problem. Well, there was still a problem, and they had to be voided over and over again. And that carried on throughout. So appellant's other arguments also find no support in the record. Generally, there's three ways to show pretext. That there's no basis in fact. That the reason for termination did not actually motivate the termination, or that there was insufficient evidence to warrant the action taken. Ms. Kovacevic takes the second approach here, claiming that poor work performance did not actually motivate her termination. To do that, she admits the factual basis, her poor work performance, admits that it could motivate dismissal. Therefore, she must show circumstances which tend to prove that AIFI terminated her in retaliation for taking the same COVID-related leave that 10 other employees took, but who were not terminated. And that that's more likely than her having been terminated for poor work performance, poor work performance that she admitted to throughout her deposition. She cannot meet this burden. She first points to, as we've discussed, the policies, claiming that the failure to give formal reviews and formal evaluations and formal progressive discipline is suggestive of pretext. But that position is contradicted by the record. The policies on their face are discretionary. AIFI's performance evaluation states, yes, all new employees will be reviewed at 30, 60, 90 days, 6 months, or at any time per manager's discretion, and annually thereafter. So Scott Goldberg, as her manager, had discretion to review her at any time, in any way. And he testified that his practice was to provide ongoing, informal coaching and training. And as I've already said, that was similar to Tom Michel, who would also tailor his performance evaluation timing and schedule to how his direct reports were progressing through training. Likewise, the progressive discipline policy states the company may discipline or discharge an employee without cause, without reason, at any time. And that it only believes in progressive discipline in appropriate circumstances. There's no suggestion in this case that this was a situation warranting progressive discipline. So therefore, the progressive discipline here is an exception, rather than a general rule. I don't understand why this wouldn't be a perfect case for progressive discipline. If somebody is doing accounting work and is making mistakes, you would think that instead of off with your head, you're fired, that the employer would want to have a progressive discipline policy to get the employee to be improving, and to get the employee to know that if they don't improve, there will be serious consequences. So you've stated there's no need to have progressive discipline here. I don't understand why I should accept that statement. Well, as Scott Goldberg testified, his practice was to do it informally. They were also working quite close together. In fact, and this is in the record, that the first six weeks of her employment, they were in the same physical office, working directly side by side. So a lot of this took place orally. And it was only at the onset of the COVID pandemic she was moved to a separate office. And so with that, they were working side by side, and his practice was to do it informally. And that is what's in the record. And meanwhile, he was looking for another person to replace her, because he did this Indeed search out. In October, yes. And contrary to appellants' statement and argument in their briefs, there was testimony. In fact, in response to counsel's direct question to Mr. Goldberg, did he discuss termination with anyone prior to November 24th when she was fired? The answer is clearly yes, in mid-August with Bob Barber. So I see I'm just about out of time. So for those reasons and for the reasons set forth in our brief, I respectfully request this court affirm the district court's grant of summary judgment in favor of American International Foods. Thank you. Thank you. With regard to whether there were conversations between Goldberg and Barber regarding Kovacevic's alleged poor performance, I would direct the court to Barber's deposition, record 66-7, page ID 622, pages 36 and 37 of the deposition. So he testified that the first time that he had heard of any of these issues related to poor performance surfacing during this six-day period of time was after Kovacevic requested her job back. And he testified that Goldberg never asked Barber to get involved in managing Kovacevic's job performance. That's our 66-7, page ID 621. But your opponent just told us that in mid-August, Goldberg discussed the termination with Barber. I'm not aware of anything in the record that says that, Your Honor. I'm not suggesting that there might not be some, but I don't recall reading that in any of the briefs, and I don't recall seeing that in any of the depositions. What Barber said, basically, is I didn't have any idea that there was this serious problem. Remember, Barber is the one that said that she was a great employee, and he tied that with a statement that she was always happy at work, but he still said and felt that she was a great employee. Can you give us a place where Barber said she was a great employee, other than the statement that it was because she was so happy every day? That is the statement, Your Honor. That's what I'm referring to. But if you're reading the whole thing, he doesn't say that she's a happy employee and therefore great. It's more she's a great employee and she's happy every day. But read it yourself. Can I go back to the mid-August thing? Yes, please. I thought in August, I have on August 31st, I'm sorry, Goldberg sent an email saying we cannot have these errors continuing to happen to her, and that is in the record. It's page ID 315. Yes, yes. That email is in the record, so there is some criticism of her performance. But as noted by my opposing counsel, most of the discussion about how she was doing was taking place orally in his office. So we sort of have a classic case where he meets with, so wait, she's making mistakes in July. He has concerns. That's undisputed. If he meets with Bob Bauer, that's undisputed. Bob who? Isn't it Barber? He meets with Barber and says, look, I have concerns. That's undisputed. No, I dispute that, Your Honor. You dispute that he met with Barber? I'm referring to the testimony that I cited in my reply brief with regard to Goldberg's discussion and when he learned of these problems that occurred after Ms. Kovacevic was on leave. Yes, but according to the district court opinion, according to Goldberg in mid-August 2020, he had a discussion with AIF's human resources manager, Robert Barber, about the possibility of terminating Kovacevic. Goldberg deposition, page 73. Is that or is that not correct? That is in the record. Also in the record is a statement that Goldberg never asked Barber to get involved in managing Kovacevic's job performance. But that's different than saying that Barber never knew that Goldberg was interested in finding a replacement. I concede that point, Your Honor. That's absolutely true. So that sort of decimates your argument that all of this happened after your client took COVID leave. I don't think it does, Your Honor, because there are going to be issues between a boss and a subordinate. But if Goldberg, who's her boss, tells this HR guy, Barber, I need to find a replacement, and that's a direct quote. He told Barber, at least I'm quoting from the DJ's opinion, told Barber that Kovacevic's, quote, work mistakes were not getting better, and it was at the point that he believed that he needed to find a replacement. If that's a correct statement, that suggests that the company was planning on terminating her as soon as they could find a replacement. Well, if that were the fact, Your Honor, certainly it does not dovetail with the testimony of Barber saying that he was never asked to get involved in managing her performance. I mean, why doesn't that, he says, look, I'm going to, if she doesn't clean up her act, I'm going to need to get a replacement. That's fine, he's just telling Barber. He can tell him, he doesn't say, I asked Barber to get involved. So that's, those are, they're not inconsistent. Yeah, Your Honor, I get back to the issue of what happens when she asks to return to work. So at that point, she's told by Barber, well, we just got to check some things. She's not told, hey, we're already looking for your replacement. She's not told before she goes out on leave, hey, we're looking for your replacement. They have to tell her? What in the law obligates them to tell her? I don't think there's anything in the law that obligates them to tell her, but it does create a picture where a jury could reject the assertion that it was simply her performance that caused her termination, based upon this particular timing. So during her employment, she's not told that they're looking for a replacement. When she goes out on leave, she's not told that they're looking for a replacement. When she calls back and says, I'm ready to return to work, she's not told that they're looking for a replacement. It's not until the next day, and at that point, that's when the record is being created by Barber and by Goldberg and by Mattice in terms of all of her job performance deficiencies. None of that is in the record until after she asks for her job back. So, Your Honor, going back to the Reeves case, this is a situation where a jury could conceivably find that, yeah, she was a poor performer and her COVID leave did not have anything to do with her termination. But a reasonable jury could also find the opposite. The jury could look at the fact that she wasn't provided a performance evaluation, and when you look at the language in both the offer letter and in the handbook, it says she will receive these reviews at 30, 60, 90, and 180 days. Thank you. I see your red light has been on, so thank you very much. Thank you, Your Honor. Thank you both for your argument, and the case will be submitted, and the clerk may call the next case.